George W. FULK, Chairman of the Pension, Profit–Sharing, and Stock Purchase Plan Committees of the Washington Group, Inc. and Ruby Irene Lester et al., Plaintiffs,

v.

Smith W. BAGLEY et al., Defendants.

Civ. A. No. 78–333–WS.

United States District Court,
M. D. North Carolina,
Winston–Salem Division.

Sept. 2, 1980.

Thomas Winfield Blackwell, Jr., Jack E. Thornton, Jr., Jack F. Canady, Winston–Salem, N. C., Loren Kieve, Steptoe & Johnson, Washington, D. C., William S. Mitchell, Winston–Salem, N. C., for George W. Fulk, Ruby Irene Lester, Irene Tomlinson, Thomas W. Shelton and William F. Suddeth.

Hubert Humphrey, James T. Williams, Jr., Greensboro, N. C., for Smith W. Bagley.

Roy G. Hall, Jr., Winston–Salem, N. C., for James R. Gilley.

Charles T. Hagan, Jr., Greensboro, N. C., for American Bank & Trust Co. of Pa.

E. Osborne Ayscue, Jr., Larry J. Dagenhart, W. Donald Carroll, Jr., Charlotte, N. C., T. V. Adams, North Wilkesboro, N. C., for Northwestern Bank.

## MEMORANDUM

MERHIGE, District Judge, Sitting by Designation.

The First Amended Complaint ("the complaint") in this cause seeks an accounting and compensatory relief from each defendant by virtue of the allegations in the complaint's three counts. Count I arises under The Employee Retirement Income Security Act of 1974 ("ERISA" or "the Act"), 29 U.S.C. § 1001 *et seq.* The second count is brought pursuant to the anti–fraud provision of The Securities Exchange Act of 1934, 15 U.S.C. § 78a *et seq.* Count III is a claim for breach of fiduciary duty which arises under the common law of the State of North Carolina.

Several motions are presently pending before the Court. Each defendant has moved to dismiss the complaint or, in the alternative, to strike portions thereof.[1]

---

1. The Court recently requested that plaintiffs submit the documents governing the employee benefit plans relevant to this action. *See* the Court's order of July 30, 1980. The Court's inquiry, upon consideration of such matters beyond the pleadings, would thus be guided by the procedures for summary judgment. Fed.R. Civ.P. 12(b)(6).

Upon further consideration, however, the Court is of the opinion that reliance upon the plan documents would serve no useful purpose. The documents were solicited in connection with Count II and, as will be seen, *infra*, the

Also pending is plaintiffs' motion to certify this suit as a class action. Additionally, plaintiffs have also moved to open discovery in this matter which has heretofore been limited to the class action certification issue. Finally, plaintiffs seek leave to amend the complaint a second time so as to add a Count IV.

Each of the aforementioned motions, with the exception of that seeking leave to amend, have been exhaustively briefed by the parties. The period within which defendants could respond to the motion to amend the complaint has expired. Each of the motions have thus ripe for consideration and will be, to the extent that it is possible at this time, resolved.

Plaintiff, George W. Fulk, served as the Chairman of the Profit–Sharing Committee of The Washington Group, Inc. ("the Company"). Fulk held this position from March 12, 1973 until at least September 30, 1976. Fulk also served as Chairman of the Company's Pension Committee between March 12, 1973 and June, 1977.

Plaintiff, Ruby Irene Lester, has been an hourly employee of the Company since 1941. Lester participated in The Washington Group, Inc. Profit–Sharing Plan for nonsalaried employees.

Plaintiff, Irene Tomlinson, is also an hourly employee of the Company of long-standing. Tomlinson, too, participated in The Washington Group, Inc. Profit-Sharing Retirement Plan for nonsalaried employees.

Plaintiff, Thomas W. Shelton, is a salaried employee of the Company. Shelton's employment with the Company began on July 22, 1957. Shelton participated in three of the Company's deferred compensation plans: The Washington Group, Inc. Profit–Sharing Retirement Plan for Salaried Employees; the Pension Plan of The Washington Group, Inc. and the Employee Stock Purchase–Savings Plan of The Washington Group, Inc.

Plaintiff, William F. Suddeth, has been a salaried employee of the Johnston Mills Company since November 26, 1956. The Johnston Mills Company was acquired by the Company on April 18, 1973. Suddeth participated in The Johnston Mills Company Profit–Sharing Plan, the Pension Plan of The Washington Group, Inc. and the Employee Stock Purchase–Savings Plan of The Washington Group, Inc.

Defendant, Smith W. Bagley, was a stockholder and director of the Company and one of its principal executive officers between April 25, 1972 and December, 1975.

Defendant, James R. Gilley, was also a Company shareholder, director and a chief executive officer; between the dates of April 25, 1972 and June 20, 1977.

Defendant, American Bank and Trust Company of Pennsylvania ("American"), is a Pennsylvania corporation which has established its principal office in Reading, Pennsylvania. From September 30, 1974 until September 30, 1975, American was Trustee of the three profit–sharing plans relevant to this action. American also served as Custodian of the Employee Stock Purchase–Savings Plan of The Washington Group, Inc. from August 29, 1974 until October 30, 1976.

Defendant, Northwestern Bank ("Northwestern") is a North Carolina corporation which maintains its principal office in North Wilkesboro, North Carolina. Between September 30, 1974 and December 31, 1977 Northwestern served as Trustee of the Pension Plan of The Washington Group, Inc. Northwestern was appointed to succeed American as Trustee to the three profit–sharing plans here in issue in September, 1975. Northwestern served in that capacity until September 30, 1976.

## I. THE MOTION TO DISMISS OR TO STRIKE

Defendants have each moved to dismiss the complaint, or alternatively, to strike

---

sufficiency of that count is equally dependent upon factual determinations personal to each plaintiff.

Accordingly, the documents will be given no consideration at this time and the motions to dismiss will be analyzed pursuant to Rule 12(b) and not Fed.R.Civ.P. 56.

certain allegations thereof. These motions assert an alleged lack of subject matter jurisdiction, failure to state a claim upon which relief may be granted, failure to plead allegations of fraud with sufficient particularity and the absence of personal jurisdiction. The latter ground was raised by American and Bagley. That issue will be treated separately, *see* Part II, *infra* ; as will all questions pertaining to the issue of class certification. *See* the Court's order of November 6, 1978, paragraph 7.

At the outset it is proper to reiterate the long–settled standard under which the Court must consider the sufficiency of the complaint when it is challenged pursuant to Fed.R.Civ.P. 12(b)(6). In *Conley v. Gibson,* 355 U.S. 41, 45–46, 78 S.Ct. 99, 102, 2 L.Ed.2d 80 (1957) the standard was stated thusly:

> In appraising the sufficiency of the complaint we follow, of course, the accepted rule that a complaint should not be dismissed for failure to state a claim unless it appears beyond doubt that the plaintiff can prove no set of facts in support of his claim which would entitle him to relief.

The Court's inquiry, then, is limited to considering whether the facts alleged, taken as true, are sufficient to state a cause of action. *See also* Fed.R.Civ.P. 8.

*A. Count I: The ERISA Claims*

Count I of the complaint alleges that defendants violated the duties imposed upon fiduciaries by ERISA. Briefly stated, the Act requires, *inter alia*, that a fiduciary administer the deferred compensation plan for the benefit of its participants; exercise skill and prudence in investing the assets of the plan; remedy, or attempt to remedy, the misconduct of co–fiduciaries; refrain from a host of prohibited transactions and administer the plan in accordance with its controlling documents.

Five deferred compensation plans are relevant to this action. For ease in discussion, the Court will employ the following abbreviated nomenclature: "Employee benefit plans" is the term which will embrace all of the deferred compensation plans. The Washington Group, Inc. Profit–Sharing Retirement Plan for Nonsalaried Employees and The Washington Group, Inc. Profit–Sharing Retirement Plan for Salaried Employees will be referred to as "the Company Plans". The Johnston Mills Company Profit–Sharing Plan will be identified by "the Johnston Mills Plan". The term, "Pension Plan" will refer to the Pension Plan of the Washington Group, Inc. Finally, the Employee Stock Purchase–Savings Plan of The Washington Group, Inc., will be denominated "the Stock Purchase Plan".

The allegations of Count I must be set forth in some detail so that defendants' challenges and the Court's views may hopefully be better comprehended. That count alleges as follows:

The Company plans were in effect prior to January 18, 1973 and were then sponsored by The Washington Mills Company. On the aforementioned date the sponsor assumed the name of the Company and, apparently, the nomenclature of the Company plans were changed, as well. The Company plans continued in existence. Wachovia Bank and Trust Company, N.A. ("Wachovia") served as Trustee of the Company plans both prior to January 18, 1973 and for some period subsequent thereto.

The Johnston Mills Plan came under the Company's sponsorship on April 18, 1973. A subsidiary of the Company acquired the Johnston Mills Company and several of the latter's affiliates on April 18, 1973. All of the acquired companies became subsidiaries of the Company. The Company continued the Johnston Mills Plan after the acquisition.

The complaint alleges that on February 26, 1974 Gilley requested Wachovia to increase the Company Plans' holdings of shares of Company stock. Gilley purportedly requested that Company stock comprise twenty percent of the Company's Plans' assets. Wachovia subsequently purchased additional shares of Company stock for the Company Plans. Company stock did not, however, exceed ten percent of the assets of the Company Plans.

The complaint further alleges that the Company ceased making contributions to the Company Plans on September 30, 1974. The Company Plans were not terminated, however, but continued in existence for purposes of making distributions. At about this same time American was named to succeed Wachovia as Trustee. Among the assets transferred to American were 6,000 shares of Company stock then valued at $99,500.00.

American purportedly sold a substantial portion of the assets of the Company Plans in October, 1974. The complaint describes the assets which were sold as "blue chip" stocks and bonds. The sale allegedly realized $440,000. The complaint states that this sale resulted, nevertheless, in a loss of $480,000. The complaint further alleges that American then purchased 13,800 shares of Company stock over a two month period. The average price for those purchases is said to be $19.20 per share. The Company Plans' investment in Company stock was allegedly increased to over forty percent of total assets.

The Company's contributions to the Johnston Mills Plan also allegedly ceased on September 30, 1974. The Johnston Mills Plan was continued, but only for purposes of distributing benefits. American was, at about this time, appointed successor Trustee for the Johnston Mills Plan. In September, 1974, the Johnston Mills Plan did not hold any shares of Company stock. American allegedly purchased 6,202.6 shares of Company stock in October and November, 1974, however. Those shares were purchased at an average price of $19.02. Company stock then comprised approximately forty percent of the Johnston Mills Plan's total assets.

The complaint charges that American continued to hold the Company stock on behalf of the Company Plans and the Johnston Mills Plan during 1975, despite the fact that the stock's market value began to decline. In July, 1975 American purportedly sold 1,784 shares of Company stock held by

the Company Plans for approximately eight dollars per share.

In September, 1975, Northwestern succeeded American as Trustee for the Company Plans and the Johnston Mills Plan. Among the assets transferred to Northwestern were, allegedly, more than 20,000 shares of Company stock. The complaint alleges that Northwestern failed to evaluate the assets of the Company Plans and the Johnston Mills Plan and failed to divest the plans of their Company stock despite a steadily declining market value.

The Company Plans and the Johnston Mills Plan were terminated in the fall of 1976. The market value of the Company's shares had purportedly fallen to approximately three dollars per share at that time.

During this period the Company also maintained the Pension Plan for the benefit of the Company's employees and the employees of its subsidiaries. Wachovia served as Trustee for the Pension Plan until September 30, 1974 when it was succeeded by Northwestern. Four thousand shares of Company stock were among the assets transferred to Northwestern.[2] The complaint charges Northwestern with failing to review Wachovia's investment decisions, failing to review the Pension Plan's investments and failing to dispose of poor investments.

The Company established the Stock Purchase Plan on August 29, 1974. American was appointed Custodian of this plan. As Custodian, American allegedly purchased shares of Company stock with funds derived from voluntary participant contributions and matching contributions from the Company. American purportedly continued to purchase Company stock while its market value declined steadily. On October 30, 1976 the Stock Purchase Plan was terminated. The Stock Purchase Plan allegedly then held more than 40,000 shares of Company stock.

---

**2.** The Pension Plan subsequently acquired an additional 400 shares of Company stock as the result of a November 15, 1974 stock dividend.

Upon the aforementioned allegations plaintiffs contend that the Act was violated in five respects. Each of the alleged violations is, in turn, founded upon two or more alternative accusations. The instant motion may be disposed of without the Court considering each allegation in great specificity.

Three of the fiduciary duties allegedly breached by defendants are set forth in § 404(a) of ERISA, 29 U.S.C. § 1104(a). The pertinent provisions of that section are as follows:

Subject to sections 1103(c) and (d), 1342, and 1344 of this title, a fiduciary shall discharge his duties with respect to a plan solely in the interest of the participants and beneficiaries and—

(A) for the exclusive purpose of:

(i) providing benefits to participants and their beneficiaries; and

(ii) defraying reasonable expenses of administering the plan;

(B) with the care, skill, prudence and diligence under the circumstances then prevailing that a prudent man acting in a like capacity and familiar with such matters would use in the conduct of an enterprise of a like character and with like aims;

\*　　\*　.　\*　　\*　　\*　　\*

(D) in accordance with the documents and instruments governing the plan insofar as such documents and instruments are consistent with the provisions of this subchapter.

Plaintiffs further contend that defendants are liable under the standards of § 405(a) of ERISA, 29 U.S.C. § 1105(a). Section 405 governs a fiduciary's liability for the breach of duty by a co–fiduciary. Subsection (a) provides for such liability under the following circumstances:

(1) if he participates knowingly in, or knowingly undertakes to conceal, an act or omission of such other fiduciary, knowing such act or omission is a breach;

(2) if, by his failure to comply with section 1104(a)(1) of this title in the administration of his specific responsibilities which give rise to his status as a fiduciary, he has enabled such other fiduciary to commit a breach; or

(3) if he has knowledge of a breach by such other fiduciary, unless he makes reasonable efforts under the circumstances to remedy the breach.

The Fifth alleged violation of ERISA arises under § 406(a), 29 U.S.C. § 1106(a). Section 406(a)(1)(D) of ERISA prohibits a fiduciary from knowingly causing a plan to engage in a transaction which, directly or indirectly, constitutes a "transfer to, or use by or for the benefit of, a party in interest" of any plan assets.

ERISA was enacted to provide a comprehensive statutory scheme for the protection of private pension rights. *Martin v. Bankers Trust Company*, 565 F.2d 1276, 1278 (4th Cir. 1977). Among the Act's provisions are prescribed minimum standards for participation, funding, vesting and, what is relevant here, fiduciary conduct. Congress strengthened these minimum standards by explicitly creating a cause of action to enforce same in favor of participants, beneficiaries and fiduciaries. 29 U.S.C. § 1132(a); § 502(a) of the Act. Jurisdiction over those causes of action is, for the most part, vested exclusively in the federal district court. ERISA § 502(e)(1); 29 U.S.C. § 1132(e)(1).

■■■■ In this circuit it is clear that the jurisdiction conferred by § 502(e)(1) of the Act is operative only upon a federal cause of action created by ERISA. *Martin, supra* at 1278. ERISA's standards of fiduciary conduct did not take effect until January 1, 1975. *Malone v. White Motor Corporation*, 435 U.S. 497, 98 S.Ct. 1185, 55 L.Ed.2d 443 (1978); ERISA § 514; 29 U.S.C. § 1144. From these principles defendants surmise the Court lacks subject matter jurisdiction as to allegations of events prior to 1975. Defendants would have the Court dismiss Count I in its entirety or, in the alternative, strike all allegations of pre–1975 events.

On its face the complaint sets forth allegations of conduct and events which occurred prior to the effective date of the pertinent sections of ERISA. However, each of the defendants concedes, either ex-

plicitly or implicitly, that the complaint contains allegations of post–1974 conduct as well. *See* Brief of Defendant Smith W. Bagley In Support of Motion to Dismiss and Strike at 6, n.4; Brief of Defendant American Bank and Trust Company of Pennsylvania at 3. Northwestern did not contest the allegations of pre–1975 acts and Gilley, in this regard, chose to rely upon the other defendants' contentions. Dismissal for want of subject matter jurisdiction would thus be inappropriate and will be denied.

Fed.R.Civ.P. 12(f) authorizes the Court to strike from a pleading, "any insufficient defense or any redundant, immaterial, impertinent, or scandalous matter." A close inspection of the complaint's allegations and ERISA's requirements demonstrates that the allegations of pre–1975 conduct cannot be characterized as "redundant, immaterial, impertinent or scandalous."

■ First, the complaint may easily be read as alleging a single scheme of misuse of the assets of the employee benefit plans and breach of duty by fiduciaries. Similar allegations were presented in *Marshall v. Craft*, 463 F.Supp. 493 (N.D.Ga.1978). In *Marshall, supra*, the complaint withstood a motion to dismiss because the allegations of post–1974 misconduct stated a cause of action under ERISA. The Court also held that ERISA could be violated even though the breach had its origin in an event preceding ERISA's effective date:

> To hold otherwise would be in large measure to insulate post–1974 actions from review simply because their roots could be traced to an event prior to the effective date of ERISA, a clearly improper result given the purpose and nature of the statute.

*Marshall, supra* at 497. The Court is of the opinion that the reasoning of *Marshall, supra* applies with equal force to the instant matter. Pre–1975 actions by the defendants may well be relevant to Count I even though, standing alone, they are not actionable under ERISA.

Contrary to defendants' assertions, it does not appear that plaintiffs seek to establish the former's ERISA liability upon pre–1975 actions. Plaintiffs may not rely upon a "continuing liability" theory of ERISA, for such is precluded by *Martin, supra*. The Court is of the opinion, however, that plaintiffs may contend that certain pre–1975 actions triggered duties imposed upon fiduciaries by ERISA.

■ In *Morrissey v. Curran*, 567 F.2d 546 (2d Cir. 1977) the plaintiffs contended that the trustees of an employee benefit plan breached their ERISA–imposed fiduciary duties by failing to divest the plan of an imprudent and unproductive investment. The investment was made prior to the effective date of the pertinent section of the Act. Nevertheless, the Court stated:

> We have no doubt that under the "prudent man" rule, which is codified in ERISA, the trustees here had a duty within a reasonable time after ERISA took effect to dispose of any part of the trust estate which would be improper to keep.

*Id.* at 548–49 (footnotes omitted). The Court adopts the reasoning that a fiduciary's pre–1975 actions may, under ERISA, necessitate action on his part after the effective date of the Act.

■ Plaintiffs advance a second ground for resisting the present motion with regard to the allegations of pre–1975 actions. Plaintiffs' second basis rests upon the Act's provision for liability for breaches of duty by a co–fiduciary. Upon consideration of this proposition, and for the reasons which follow, the Court deems plaintiffs' argument to be well–taken.

Section 405(a)(3) of the Act, 29 U.S.C. § 1105(a)(3), provides that a fiduciary shall be liable for a breach of duty by his co–fiduciary if he knows of the latter's misconduct and yet fails to make a reasonable attempt to cure the breach. The question presented for immediate consideration is whether § 405(a)(3) may support a claim premised upon the co–fiduciary's pre–ERISA misconduct. The Court is persuaded by Judge Lumbard's concurrence in *Morrissey, supra* and concludes that § 405(a)(3) may support such a cause of action. In reaching this conclusion the Court is mindful of the

rule announced in *Martin, supra* at 1278 (29 U.S.C. § 1144 precludes federal jurisdiction over a claim based upon pre–ERISA actions), but does not find it to require a contrary conclusion.

Section 405(a)(3) speaks of a breach of the co–fiduciary's duty. It does not limit itself to a breach of ERISA (unlike other sections of the Act. *See, e. g.,* 29 U.S.C. § 1132.) The inference which is readily drawn from § 405(a)(3)'s language is that ERISA requires a fiduciary to act when his co–fiduciary, prior to January 1, 1975, breaches a duty owed to the beneficiaries of a plan.

The Court does not believe this to be an unreasonable or too–broadening interpretation of § 405(a)(3). The Act, of course, explicitly provides for the fiduciary's liability for breaches of his co–fiduciary. The application of § 405(a)(3) is limited to those instances in which the fiduciary has knowledge of his co–fiduciary's misconduct. With that limitation, the burden upon the fiduciary is no greater than that imposed to remedy his own pre–ERISA breaches. Section 405(a)(3) further limits the fiduciary's duty to act "[to] reasonable efforts under the circumstances." Finally, the Court emphasizes that liability under § 405(a)(3) is neither derivative nor predicated upon the fiduciary's pre–ERISA misconduct. Rather, the Court's interpretation is that the fiduciary's duty to act, and his liability for failure to do so, arises on or after January 1, 1975. The fact that the ERISA duty is triggered by a pre–1975 event should not permit the fiduciary to avoid his duties under the Act.

■ ERISA's fiduciary obligations, by definition, extend only to "fiduciaries". Bagley and Gilley maintain that the complaint simply identifies them as fiduciaries in a conclusory fashion without alleging facts to support that conclusion. Thus, they contend, Count I fails to state a cause of action against them and should be dismissed.[3] For the reasons which follow, the Court disagrees and thus, these motions will be denied.

ERISA contains a most specific definition of the term "fiduciary". Section 3(21)(A) of the Act, 29 U.S.C. § 1002(21)(A), provides, in pertinent part:

a person is a fiduciary with respect to a plan to the extent that (i) he exercises any discretionary authority or control respecting management of such plan or exercises any authority or control respecting management or disposition of its assets, (ii) he renders investment advice for a fee or other compensation, direct or indirect, with respect to any moneys or other property of such plan, or has authority or responsibility to do so, or (iii) he has any discretionary authority or discretionary responsibility in the administration of such a plan.

The Court is of the view that the complaint alleges facts which, if proven, would show Bagley and Gilley to be fiduciaries within the meaning of ERISA § 3(21)(A).

The Department of Labor, which is responsible for administering ERISA in conjunction with the Internal Revenue Service, periodically issues Interpretive Bulletins. One such bulletin posed and answered questions regarding the breadth of fiduciary status:

Q: In the case of a plan established and maintained by an employer, are members of the board of directors of the employer fiduciaries with respect to the plan?

A: Members of the board of directors for an employer which maintains an employee benefit plan will be fiduciaries only to the extent that they have responsibility for the functions described in section 3(21)(A) of the Act. For example, the board of directors may be responsible for the selection and retention of plan fiduciaries. In such a case, members of the board of directors exercise "discretionary authority or discretionary control respecting management of such plan" and are,

---

**3.** American and Northwestern apparently concede that their trusteeships rendered them "fiduciaries" within the contemplation of The Act.

therefore, fiduciaries with respect to the plan. However, their responsibility, and consequently, their liability, is limited to the selection and retention of fiduciaries (apart from cofiduciary liability arising under circumstances described in section 405(a) of the Act).

29 C.F.R. § 2509.75–8 (1979) at D–4. The Interpretive Bulletin is consistent with the definition of "fiduciary" contemplated by the Congress. *See* H.R.Rep.No. 93–1280, 93d Cong., 2d Sess. 323, *reprinted in* [1974] U.S.Code Cong. & Admin.News, pp. 5038, 5103.

Count I alleges that Bagley and Gilley were members of the Company's board of directors. It is conceivable that plaintiffs may prove that Bagley and Gilley, as directors, exercised or possessed the requisite authority and responsibility with respect to the plan such that they may be deemed "fiduciaries". The same may also be said of Bagley and Gilley holding the two principal executive offices in the Company. The Court is cognizant that these positions, in and of themselves, will not render an officer or director a fiduciary. *See* 29 C.F.R. § 2509.75–8 (1979) at D–5. That, however, presents an issue of proof, the consideration of which is premature at this stage in the litigation.

It is also apparent that in defining "fiduciary" Congress was peculiarly concerned with realities, as distinguished from mere formalities. Thus Congress determined that fiduciary status should extend to all those exercising control over employee benefit plans without regard to their office or formal relationship with the plan. For example, H.R.Rep. 93–1280, *supra* provides that, "the definition [of 'fiduciary'] includes persons who have authority and responsibility with respect to the matter in question regardless of their formal title." *See also, Eaves v. Penn,* 587 F.2d 453 (10th Cir. 1978) ("[O]fficers and directors of the plan sponsor are fiduciaries if they exercise control through the selection of the investment committee, administrative committee or plan officers or directors.")

The complaint may be read as alleging that Bagley and Gilley possessed authority to select, or participate in the selection of trustees or custodians for the employee benefit plans. The complaint infers, especially as to Gilley, that this authority was used to influence the investment of plan assets. In addition to their Company offices and directorships, sufficient *de facto* control might also be established by proof, if any there be, that Bagley and Gilley, as shareholders, controlled the Company. For the foregoing reasons the Court is of the opinion that Count I of the complaint alleges sufficient facts to state a cause of action against Bagley and Gilley. Their Rule 12(b)(6) motions will therefore be denied.

*B. Count II: The Securities Claims*

Count II purports to state a claim for relief under The Securities Exchange Act of 1934 ("the 1934 Act"), 15 U.S.C. §§ 78a *et seq.,* and the rules promulgated thereunder. The allegations heretofore summarized in the preceding section are relied upon by plaintiffs as violating § 10b of the 1934 Act, 15 U.S.C. § 78j(b) as well as Rule 10b–5 of the Securities Exchange Commission, 17 C.F.R. § 240.10b–5.

The complaint, in paragraph 50, charges defendants with misrepresenting unto the plaintiffs that the assets of the employee benefit plans would be prudently invested by the plans when, in fact, the plans were the subject of self–dealing and other breaches of fiduciary obligations. Count II further alleges that defendants failed to advise plaintiffs that assets of the employee benefit plans were being invested in stock which was not of a fiduciary quality.

■ Section 10(b) of the 1934 Act proscribes a wide range of conduct which occurs "in connection with the purchase or sale of *any security* . . . ." (emphasis added). In order to prosecute this action, then, plaintiffs must not only demonstrate a purchase or sale, *Blue Chip Stamps v. Manor Drug Stores,* 421 U.S. 723, 95 S.Ct. 1917, 44 L.Ed.2d 539 (1975), but they must also show that said transaction involved a security.

To meet this threshold requirement plaintiffs would characterize their participation rights in the respective employee benefit plans as "investment contracts".[4] The 1934 Act, in § 3(a)(10), 15 U.S.C. § 78c(a)(10), includes "investment contracts" within its definition of a "security". Defendants, relying upon *International Brotherhood of Teamsters v. Daniel*, 439 U.S. 551, 99 S.Ct. 790, 58 L.Ed.2d 808 (1979), would have the Court dismiss Count II on the grounds that such a participation right is not an investment contract.

In *Daniel, supra*, the Court held that an employee's interest in a compulsory, noncontributory deferred compensation plan was not an investment contract within the meaning of the 1934 Act. Respondent there was thus precluded from prosecuting a suit under the antifraud provisions of both the 1934 Act and the Securities Exchange Act of 1933, 15 U.S.C. § 77a, *et seq.*

In reaching this conclusion, the Court, as it has repeatedly in the past, followed the analysis enunciated in *SEC v. W. J. Howey Co.*, 328 U.S. 293, 66 S.Ct. 1100, 90 L.Ed. 1244 (1946). To determine whether an interest constitutes an investment contract, "[t]he test is whether the scheme involves an investment of money in a common enterprise with profits to come solely from the efforts of others." *Howey, supra* at 301, 66 S.Ct. at 1104.

In *Daniel, supra* the pension plan was noncontributory, *i. e.* employees did not contribute money or other consideration to the plan. The plan was instead funded solely[5] from employer contributions. The employer's contributions did not constitute an "investment of money" by or on behalf of the employee because the former's obligation was to the fund, rather than the employee, and because there was no fixed relationship between the contributions and the employee's benefits. The Court was also clear that it would indeed be the rare situation where the employee's labor would satisfy the first branch of *Howey, supra.*

It is also clear from *Daniel, supra* that in order to fulfill the "investment of money" aspect of *Howey, supra* the plan must not only *provide* for employee contributions, but the particular employee/plaintiff must also have *contributed.* In this regard the court stated:

> In every decision of this Court recognizing the presence of a "security" under the Securities Acts, the person found to have been an investor chose to give up a specific consideration in return for a separable financial interest with the characteristics of a security. . . . In every case the purchaser gave up some tangible and definable consideration in return for an interest that had substantially the characteristics of a security.

439 U.S. at 559, 99 S.Ct. at 796–797 (citations omitted).

The expectation of profits from a common enterprise is the more significant inquiry, however. *United Housing Foundation, Inc. v. Forman*, 421 U.S. 837, 852, 95 S.Ct. 2051, 2060, 44 L.Ed.2d 621 (1975). This element of an investment contract was not present in *Daniel, supra*, since the largest portion of the plan's income was derived from employer contributions rather than earnings on the plan's assets. Also significant was the employer's obligation to cover shortfalls in earnings; a trait common to many pension plans. Finally, the Court noted that substantial vesting requirements, rather than investment success, is often the greatest obstacle in realizing an employee's benefits expectations.

The *Daniel, supra*, and *Howey, supra*, analysis has been applied to a limited number of pension related claims brought pursuant to the federal securities laws. In *Black v. Payne*, 591 F.2d 83 (9th Cir. 1979)

---

4. The complaint is ambiguous with regard to whether plaintiff Fulk seeks to pursue a § 10(b) claim on behalf of the employee benefit plans themselves. Nor does it appear that any party has addressed this point. The ambiguity may perhaps be resolved by either subsequent defensive pleadings or by amending the complaint.

5. The plan earned income upon its assets but the contributions were derived solely from the employer.

the court found that interests in a compulsory, but contributory pension plan did not constitute an investment contract because benefits were not keyed to the profits of a common enterprise. *Id.* at 87. In *Tanuggi v. Grolier Incorporated,* 471 F.Supp. 1209 (S.D.N.Y.1979) a voluntary and contributory pension plan was deemed not to be an investment contract. This conclusion rested in large measure upon the factual findings that, "the benefits an employee . . . [receives] have only a tenuous connection to the investment success of the pension fund," *Id.* at 1214, and that the employer was obligated to cover shortfalls in earnings. *Cf.* 17 C.F.R. § 231.6188, [current binder]. CCH Fed.Sec.L.Rptr. § 1051 at 2073–10 (SEC release February 1, 1980) (Interpreting § 3(a)(10) of the 1934 Act in light of *Daniel, supra*).

■ The preceding discussion is sufficient to demonstrate that the *Daniel, supra* and *Howey, supra* inquiry necessitates an initial factual inquiry. Is the relevant plan compulsory or voluntary? Is the plan contributory or noncontributory? If it is contributory, did the plaintiff in fact make contributions? To what extent are benefits from the relevant plan related to the plan's investment success? Are the vesting requirements substantial; either in theory or in fact? Undoubtedly, many more pertinent questions will arise as the factual record for each plan is developed. In any event, the Court cannot at this time, in keeping with the applicable standard, determine with certainty that the employee benefit plans in the instant matter are not investment contracts.[6] Defendants' motions in this regard must therefore be denied.[7]

Northwestern further asserts that Count II does not satisfy the particularity requirement of Fed.R.Civ.P. 9(b). That Rule provides that

In all averments of fraud or mistake, the circumstances constituting fraud or mistake shall be stated with particularity. Malice, intent, knowledge and other condition of mind of a person may be averred generally.

An identical challenge was rejected by the Court in *Gilbert v. Bagley,* 492 F.Supp. 714 (M.D.N.C.1980). In its June 2, 1980 memorandum the Court emphasized that Rule 9(b)'s particularity requirement must be considered in light of its intended purpose and in conjunction with Fed.R.Civ.P. 8. The Court adheres to that approach.

■ Rule 9(b) is intended to satisfy two salutory objectives. First, it insures that a defendant is afforded fair notice of the nature of the plaintiff's claim and the grounds upon which it is based. *See e. g., Denny v. Barber,* 576 F.2d 465, 469 (2d Cir. 1978). Second, the particularity requirement insures that allegations of fraud will not be advanced lightly or without some factual basis. *See e. g., Segal v. Gordon,* 467 F.2d 602 (2d Cir. 1972); *Clark v. Cameron–Brown Co.,* 72 F.R.D. 48 (M.D.N.C.1976). *See also* 5 C. Wright and A. Miller, *Federal Practice and Procedure,* Civil § 1296 (1969).

The particularity requirement should not be interpreted without regard to the notice pleading theory espoused by Rule 8. Instead, the two Rules should be read as being complementary:

It is inappropriate to focus exclusively on the fact that Rule 9(b) requires particularity in pleading fraud. This is too narrow an approach and fails to take account of the general simplicity and flexibility contemplated by the rules.

5 C. Wright and A. Miller, *Federal Practice and Procedure,* Civil § 1298 (1969).

---

**6.** Plaintiffs' opposition to motions to dismiss concedes that the Pension Plan in this matter was noncontributory. It will thus be difficult for plaintiffs to demonstrate "an investment of money" or any other investment decision. A ruling upon whether a participant's interest in the Pension Plan constituted an investment contract must await another time. Plaintiffs will still be afforded an opportunity to satisfy the *Howey, supra,* rationale. The Court's initial impressions here stated should not be construed as intimating its final conclusion in this regard.

**7.** The Court will not, and need not, address the various contentions regarding the "purchase or sale" requirement of *Blue Chip Stamps, supra,* or the other elements of a § 10(b) action, until it has been determined that the participation interests were investment contracts.

■ The Court remains of the view that a plaintiff complies with Rule 9(b) when the complaint gives the defendant the fair notice to which he is entitled and, at the same time, evidences a reasonable belief on the part of the plaintiff that there is merit to his claim. As the court observed in *Cameron–Brown, supra* :

> In class action securities cases it is not always practical to require the plaintiffs to plead with absolute particularity even though their allegations are based on information and belief. The sufficiency of a pleading turns upon consideration of a number of factors, not the least of which is whether the action seeks to redress a wrong, not to find one.

*Cameron–Brown, supra* at 61. To require greater specificity would undermine the pleading theory embraced by Rule 8. A more complete statement of this view may be found in *Poller v. First Virginia Mortgage and Real Estate Investment Trust,* [1978 Transfer Binder] CCH, Fed.Sec.L. Rptr. § 96,564 (E.D.Va.1978).

■ Upon a review of the complaint, the Court is of the opinion that Count II satisfies the particularity requirement of Rule 9(b) as it is discussed in the preceding paragraphs. The complaint alleges a single, on–going scheme to manipulate the market value of the Company's stock. The complaint further alleges the transactions deemed to be an integral part of the scheme; as well as the approximate dates thereof. Count II, in large part, appears to be premised on defendants' alleged failure to disclose material information during the entire period covered by the complaint. The truth or falsity of the alleged omission is a matter peculiarly within the knowledge of the defendants. Accordingly, the pleading requirements should be given a liberal interpretation. *Fox v. Prudent Resources Trust,* 382 F.Supp. 81, 95 (E.D.Pa.1974); 2A Moore, *Federal Practice* § 9.03.

### C. Count III–Common Law Fiduciary Duty

Defendants have challenged the sufficiency of Count III's allegations on several grounds. The Court has considered each of these contentions as well as the memoranda submitted by the parties in support of their respective positions. For the reasons which follow, the Court is of the opinion that the motions to dismiss Count III must also be denied.

Each of the defendants would have the Court dismiss Count III for lack of subject matter jurisdiction. For the most part, this argument is premised upon defendants' positions with regard to dismissal of Counts I and II and the fact that Count III arises under the common law of North Carolina. The Court's view with respect to Counts I and II, however, destroys defendants' syllogism regarding the exercise of pendent jurisdiction.

■ Counts I and II arise under federal law and subject matter jurisdiction over those claims vests in the court pursuant to 29 U.S.C. § 1132(e)(1) and 15 U.S.C. § 78aa. The Court is satisfied that the allegations of Count III and the federal claims arise from "a common nucleus of operative fact." *United Mine Workers v. Gibbs,* 383 U.S. 715, 725, 86 S.Ct. 1130, 1138, 16 L.Ed.2d 218 (1966). From this the Court concludes that it has the power to entertain Count III.

In *Gibbs, supra* the court made clear that the district court possesses discretion as to whether to exercise the power presented under the pendent jurisdiction doctrine. American contends that the Court should decline to take jurisdiction over Count III. In this regard American argues that Count III's state law claims will assume a predominant role in this matter since the pre–1975 allegations are not actionable under ERISA.

The Court cannot accept American's conclusions for several reasons. Evidence of defendants' pre–1975 actions will likely be introduced in connection with Count I without regard to Count III. Pre–1975 events may also be relevant as to Count II, if that claim proceeds to the merits. Judicial economy and fairness also weigh in favor of the exercise of pendent jurisdiction in this mat-

ter. This is especially true since 29 U.S.C. § 1132 requires that Count I be prosecuted in the district court and 29 U.S.C. § 1144 supersedes the relevant state law cause of action effective January 1, 1975.

■ Northwestern and American further contend that the complaint fails to state a cause of action for breach of fiduciary duty under North Carolina law. The Court need not dwell on this issue. The complaint charges defendants with intentional self–dealing, mismanagement and fraud and negligently falling short of the prudence and diligence required of fiduciaries. This is sufficient to withstand a motion under Fed.R.Civ.P. 12(b)(6). *Wachovia Bank and Trust Company v. Johnston*, 269 N.C. 701, 153 S.E.2d 449, 457 (1967); *Poindexter v. First National Bank of Winston–Salem*, 244 N.C. 191, 92 S.E.2d 773, 775 (1956); *Tayloe v. Tayloe*, 108 N.C. 69, 12 S.E. 836, 838 (1891).

■ Northwestern and American also contend that Count III fails to plead fraud with the particularity required by Fed.R.Civ.P. 9(b). Initially it must be emphasized that Count III rests upon allegations of several types of misconduct. It is not limited to fraud. The Court considered this challenge pursuant to the standard discussed in subpart B., *supra*. Northwestern's and American's challenges have been found to be without merit.

The complaint alleges that defendants, all of whom are claimed to be fiduciaries, had interests and objectives which were inconsistent with those of the trust beneficiaries. The complaint sets forth the approximate dates on which shares of Company stock were bought and sold. The complaint also states when other assets of the employee benefit plans were sold. The complaint questions whether the prudent investor standard would permit the Company Plans and the Johnston Mills Plan to hold such a large percentage of their assets in Company stock. The Court is of the opinion that defendants have been given fair notice of the plaintiffs' claims. The complaint is sufficiently precise to evidence a reasonable belief that a wrong has been committed.

As has been seen, Rule 9(b) requires nothing more.

## II. PERSONAL JURISDICTION

■ Bagley and American also seek dismissal of the complaint for want of personal jurisdiction. Fed.R.Civ.P. 12(b)(2). In this regard Bagley asserts that he has not resided in North Carolina since 1975 and that he no longer maintains an office in the state. American, for its part, avers that it transacts no business in North Carolina, is not authorized to do so and that its relationship with the Company was centered upon Pennsylvania. Bagley and American thus conclude that they are not amenable to suit under the North Carolina long–arm statute, N.C.G.S. § 1–75.4. They further argue that the exercise of jurisdiction over them would abridge the due process guarantees of *International Shoe Co. v. Washington*, 326 U.S. 310, 66 S.Ct. 154, 90 L.Ed. 95 (1945). These arguments were presented to the Court in *Gilbert, supra*, and rejected. Defendants' assertions are no more persuasive in the instant case.

Fed.R.Civ.P. 4(f) provides for service of process anywhere within the territorial limits of the state where the district court is held and, "when authorized by a statute of the United States . . . beyond the territorial limits of that state." Rule 4(f) thus recognizes the power of Congress to provide for nationwide service of process in an action to enforce a federal right. *Mississippi Publishing Corporation v. Murphree*, 326 U.S. 438, 66 S.Ct. 242, 90 L.Ed. 185 (1946). This power was recognized in *Robertson v. Railroad Labor Board*, 268 U.S. 619, 45 S.Ct. 621, 69 L.Ed. 1119 (1925), and rests upon a sovereign's fundamental right to exercise jurisdiction over defendants within its territory. *First Flight Co. v. National Carloading Corporation*, 209 F.Supp. 730, 736 (E.D.Tenn.1962).

Section 502(e)(2) of ERISA, 29 U.S.C. § 1132(e)(2) provides for such nationwide service of process:

Where an action under this title is brought in a district court of the United

States, it may be brought in the district where the plan is administered, where the breach took place, or where a defendant resides or may be found, and process may be served in any other district where a defendant resides or may be found. Congress intended to open the federal forum to ERISA claims to the fullest extent possible. S.Rep.No. 93–127, 93d Cong., 1st Sess. 35, *reprinted in* [1974] U.S.Code Cong. & Admin.News.

Likewise, § 27 of the 1934 Act, 15 U.S.C. § 78aa, provides, in pertinent part:

Any suit or action to enforce any liability or duty created by this chapter or rules and regulations thereunder, or to enjoin any violation of such chapter or rules and regulations, may be brought in any such district or in the district wherein the defendant is found or is an inhabitant or transacts business, and process in such cases may be served in any other district of which the defendant is an inhabitant or wherever the defendant may be found.

There are thus explicit provisions for bringing Bagley and American before this court with regard to Counts I and II of the complaint.

The Court is of the further opinion that the doctrine of pendent personal jurisdiction affords a basis for rendering Bagley and American amenable to Count III. Recent cases have held that § 27 of the 1934 Act may confer personal jurisdiction over a defendant for more than simply securities law claims. *Robinson v. Penn Central Co.,* 484 F.2d 553 (3d Cir. 1973); *Schwartz v. Eaton,* 264 F.2d 195 (2d Cir. 1959) (dictum); *Warren v. Bokum Resources Corp.,* 433 F.Supp. 1360 (D.N.M.1977); *Bertozzi v. King Louie Int'l, Inc.,* 420 F.Supp. 1166 (D.R.I.1976); *Sohns v. Dahl,* 392 F.Supp. 1208 (W.D.Va.1975); *Oxford First Corp. v. PNC Liquidating Corp.,* 372 F.Supp. 191 (E.D.Pa.1974); *Getter v. R. G. Dickinson & Co.,* 366 F.Supp. 559 (S.D.Iowa 1973); *Allen Organ Co. v. North American Rockwell Corp.,* 363 F.Supp. 1117 (E.D.Pa.1973); 2 Moore, *Federal Practice and Procedure,* Civil § 1125. *Contra, Trussel v. United Underwriters, Ltd.,* 236 F.Supp. 801 (D.Colo.1964) and cases cited in *Bertozzi, supra* at 1171–72, n.1. In the instant case pendent personal jurisdiction serves both the substantive schemes of ERISA and the 1934 Act and the considerations of judicial economy underlying pendent subject matter jurisdiction.

Defendants' due process claims are, in the Court's view, without merit. First, the Court does not consider *International Shoe, supra* controlling. The issue there presented was the fairness of a state court's exercise of extraterritorial jurisdiction. That question is readily distinguishable from the case at bar where the sovereign–the United States of America–is simply invoking its judicial power within its territory. *International Shoe, supra* would be relevant where a federal district court, *e. g.,* attempts to exercise jurisdiction over a Canadian citizen by service of process perfected in that country. *SEC v. Myers,* 285 F.Supp. 743 (D.Md. 1968).

*Fitzsimmons v. Barton,* 589 F.2d 330 (7th Cir. 1979), too, counsels that defendants' constitutional challenge must be rejected. The court there rejected a similar argument by an Oklahoma defendant which was directed to the exercise of jurisdiction by the Illinois district court:

Here the sovereign is the United States, and there can be no question but that the defendant, a resident citizen of the United States, has sufficient contacts with the United States to support the fairness of the exercise of jurisdiction over him by a United States court.

*Id.* at 333 (footnote omitted). And, if due process requires more, it is present in this action. Discovery constitutes the largest effort in complex litigation today. The discovery burden will be largely unaffected by the venue. Furthermore, Bagley concededly had substantial ties to North Carolina. American, as trustee or custodian of several of the Company's employee benefit plans surely appreciated that its duties would have a far greater impact beyond Pennsylvania than within. Finally, judicial economy is served by the presence of all the defendants in one action. Bagley's and

American's motions pursuant to Fed.R. Civ.P. 12(b)(2) will therefore be denied.

## III. CERTIFICATION AS A CLASS ACTION

■ The motion for certification of this suit as a class action must continue under advisement. In *In re The Washington Group, Inc.*, in Chapter X Reorganization Numbers B–77–695 through B–77–702 (September 5, 1979), the Court determined that the Company's Reorganization Trustee, Richard A. Gilbert, may not defray the litigation expenses of the plaintiffs in this action. The appeal of that order is pending before the United States Court of Appeals for the Fourth Circuit.

The principal issue presented in a motion for class certification is the ability of the designated plaintiffs to represent the interests of the entire class. As a practical matter, the ability and willingness of the plaintiffs to bear the expenses of this action is essential to their fair representation of the class.

The inability of the Company's Trustee to defray the costs of this litigation brings the plaintiffs' ability and willingness to do so into question. This is particularly true where, as here, the designated plaintiffs appear to have been assured prior to the commencement of the action that they would not be responsible for litigation expenses.

The Court cannot, upon the present record, make a finding as to the ability and willingness of the named plaintiffs to shoulder the costs of this matter. Accordingly, the record must be supplemented and the Court will entertain a motion to reopen discovery on the class certification, if necessary.

## IV. MOTION TO OPEN GENERAL DISCOVERY

■ Previous orders of this Court have heretofore limited discovery in this action to the issue of class certification. Plaintiffs have moved to open general discovery on the merits of the case. Plaintiffs also seek an order requiring defendants to respond to pending discovery requests within thirty (30) days from the order opening discovery. The Court has reviewed the parties' memoranda and concluded that plaintiffs' motion is well taken.

Defendants offer three grounds for opposition to this motion. Two of these contentions are moot. The related criminal action, which was the principal reason for the Court's stay of discovery, has concluded. Defendants' motions to dismiss have been addressed in this memorandum and thus are no longer an obstacle to discovery.

Defendants' third basis for resisting the opening of discovery relates to the still unresolved issue of class certification. Defendants rely upon § 1.40 of the Manual for Complex Litigation (1977) which states:

> It is recommended that no discovery on the merits be permitted during the discovery of the class action issue, except as is relevant to the class action determination.

The Court recognizes that in most instances the Manual states the preferred approach. Nevertheless, the Court is persuaded that extenuating circumstances counsel in favor of a departure from normal procedure.

The original complaint in this action was filed on July 26, 1978. The issues have remained unresolved for two years. Although, as defendants contend, this is not an unreasonable time in such complex litigation, in light of the interests involved, *e. g.*, plaintiffs' retirement benefits, further delay cannot be countenanced.

Furthermore, additional discovery is likely to occur with regard to the class certification issue. That fact, and the discovery previously taken, should prevent the substantive discovery from becoming too burdensome or inefficient even if this matter does not proceed as a class action. Finally, the parties may diminish any inefficiency in proceeding with discovery by supplementing the record on the certification question to the end that the issue may be promptly resolved.

## V. LEAVE TO AMEND THE COMPLAINT

▮ Plaintiffs seek leave to amend the complaint, a second time, in.order to add a Count IV. The new count would purportedly state a claim under § 5 of The Securities Act of 1933, 15 U.S.C. § 77e.

This matter is, relatively speaking, still in its infancy. Substantive discovery is soon to begin. Defendants, by virtue of the pendency of the instant motion, have not yet answered the complaint. The Court is of the opinion, therefore, that it would be proper to permit such amendment.