900 F.2d 256
 58 USLW 2619, 12 Employee Benefits Ca 1304
 Unpublished Disposition
NOTICE: Fourth Circuit I.O.P. 36.6 states that citation of unpublished dispositions is disfavored except for establishing res judicata, estoppel, or the law of the case and requires service of copies of cited unpublished dispositions of the Fourth Circuit.
Jack L. THOMAS, Individually, on behalf of the Tru-Tech,
Inc., Pension Plan, and as Representative of Class
of Plaintiffs Similarly Situated,
Plaintiff-Appellant,
v.
TRU-TECH, INC.; D. Grant Peacock; Grant Peacock and
Company, Inc., Defendants-Appellees,
and
Connecticut General Life Insurance Company, Defendant.
Jack L. THOMAS, Individually, on behalf of the Tru-Tech,
Inc., Pension Plan, and as Representative of Class
of Plaintiffs Similarly Situated,
Plaintiff-Appellee,
v.
TRU-TECH, INC., Defendant-Appellant,
and
D. Grant Peacock, Grant Peacock and Company, Inc.;
Connecticut General Life Insurance Company, Defendants.
 Nos. 89-2001, 89-2003.
 United States Court of Appeals, Fourth Circuit.
 Argued: Jan. 10, 1990.
Decided: April 3, 1990.
 
 Appeals from the United States District Court for the District of South Carolina, at Spartanburg. G. Ross Anderson, Jr., District Judge. (CA-87-2243-3)
 J. Kendall Few, Greenville, S.C. (Argued), for appellant; James R. Gilreath, Greenville, S.C. on brief.
 David Lynn Freeman, Wyche, Burgess, Freeman & Parham, P.A., Greenville, S.C. (Argued), for appellees; James M. Shoemaker, Wyche, Burgess, Freeman & Parham, P.A., Greenville, S.C., on brief.
 D.S.C.
 AFFIRMED.
 Before DONALD RUSSELL and CHAPMAN, Circuit Judges, and RICHARD L. WILLIAMS, United States District Judge for the Eastern District of Virginia, sitting by designation.
 CHAPMAN, Circuit Judge:
 
 
 1
 This appeal arises out of a class action brought by Jack L. Thomas ("Thomas") against Tru-Tech, Inc. ("Tru-Tech"), D. Grant Peacock ("Peacock"), Grant Peacock and Co. Inc. ("GP & C") and Connecticut General Life Insurance Company ("CGLIC") alleging, inter alia, breach of fiduciary duty under the Employment Retirement Income Security Act of 1974, 29 U.S.C. Secs. 1001 et seq. (1989) ("ERISA"). The district court, following a trial to the bench, held Tru-Tech liable for breach of fiduciary duty, but found that Peacock and GP & C were not fiduciaries under the Plan and thus could not be liable for breach of fiduciary duty. Thomas appeals, arguing that the district court erred in finding that Peacock and GP & C were not fiduciaries. Tru-Tech appeals, arguing that the district court erred in finding that the amendment to the Plan was authorized by Tru-Tech's Board of Directors and that Tru-Tech's Plan was approved by the IRS. We conclude that the district court did not clearly err as to its findings of fact and made no errors of law.
 
 
 2
 * Located in Spartanburg, South Carolina, Tru-Tech was formed in 1981 to take over a textile machinery business previously operated by Rockwell International Corporation. Tru-Tech's Chairman of the Board was Peacock, who also owned and operated GP & C, a Pittsburgh company that was initially a business brokerage business and later a company managing other business interests of Peacock and his business associates. Tru-Tech shared offices in Pittsburgh with GP & C.
 
 
 3
 In a resolution of the Board of Directors dated December 4, 1981, Tru-Tech adopted a pension plan for its salaried workers ("Plan"). This Plan provided for ten-year "cliff" vesting under which an employee would become fully vested following ten years of service. The Board did not discuss or specify the "cliff" vesting schedule, but gave its general approval of the Plan. Although it stated an effective date of October 1, 1981, the adoption of the Plan was "subject to the condition precedent that the Plan shall be approved and qualified by the Internal Revenue Service." The Board of Directors also resolved that "such executive officers are hereby authorized to make such technical or administrative amendments to the Plans ... as they in their discretion deem advisable or as may be requested by the Internal Revenue Service or other governmental authorities."
 
 
 4
 The adoption agreement was subsequently executed on December 29, 1981, by Bill Wilcock, President of Tru-Tech. However, Tru-Tech did not submit the Plan to the IRS for approval until December 31, 1982, and the IRS informed Tru-Tech on July 21, 1983, that the cliff vesting schedule was not acceptable and that a vesting period at least as liberal as a 4-40 vesting schedule was required; under such schedule, covered employees would become 40% vested after four years and 100% vested after eleven years. Wilcock and B.J. Myers, Assistant Secretary of Tru-Tech, executed an amendment to the Plan on September 14, 1983, in which a 4-40 vesting schedule was adopted. The IRS's records indicate that this "amendment to the plan was approved on 5/30/84 as a National Office Technical Advice Memorandum." The amendment, while not approved by the Board, was prepared by Tru-Tech's insurance agent and approved by Tru-Tech's counsel.
 
 
 5
 Meanwhile, Tru-Tech had serious financial problems because of continuing operating losses and obtained a funding waiver, allowing it to stop funding the Plan. Peacock testified that the declining business situation led to conflict between Wilcock and the Board, resulting in his resignation within weeks of the amendment to the Plan. At that point, T.H. Williams, who was Vice President of GP & C, became Executive Vice President of Tru-Tech. Unaware of the amendment made by Wilcock and Myers, Williams notified the Board of the IRS's rejection of the cliff vesting schedule. The Board decided against any change in the Plan and resolved on April 17, 1984, that the Plan "will be terminated and replaced with a profit sharing plan." After discovering the existence of the amendment, Williams wrote the IRS in July, August, and October of 1984, advising that the amendment was not approved by the Board and requesting an adverse determination. The IRS issued its proposed adverse determination on January 31, 1985, which, since no appeal was taken, became final on May 23, 1985. As a result, the Plan was terminated and its assets were refunded to Tru-Tech with interest.
 
 
 6
 Thomas brought this class action on August 24, 1987. After a one-day bench trial, the district court held on August 31, 1988, that Tru-Tech had breached its fiduciary duty under the Plan and ERISA and awarded the plaintiffs $187,628.93 and attorney's fees. In particular, the district court found that Tru-Tech's amended Plan was approved and qualified by the IRS and that Tru-Tech's attempt to revert to the cliff vesting schedule was done to bring about a termination of the Plan and a return of its funds. However, the court held that Peacock and GP & C were not fiduciaries under the Plan and could not be liable for breach of fiduciary duty.
 
 II
 
 7
 Thomas argues that the district court clearly erred in finding that neither Peacock nor GP & C were liable as fiduciaries under ERISA. The Act allows suits for breach of fiduciary duty only against persons who are fiduciaries. 29 U.S.C. Sec. 1109(a) (1989); Gelardi v. Pertec Computer Corp., 761 F.2d 1323, 1324-25 (9th Cir.1985). To identify a fiduciary, one looks first to the terms of the plan, which must "provide for one or more named fiduciaries who jointly or severally shall have authority to control and manage the operation and administration of the plan." 29 U.S.C. Sec. 1102(a)(1). See also ERISA Interpretive Bulletin 75-8, 29 C.F.R. Sec. 2509.75-8 (1983) ("Each plan must, of course, have at least one named fiduciary...."). If a plan designates a person or entity a "named fiduciary," then such person or entity is presumptively a fiduciary and subject to liability under ERISA. See Yeseta v. Baima, 837 F.2d 380, 384 (9th Cir.1988). In this case, Paragraph 1.26 of the Plan states that the term "named fiduciary" means "the Administrator and any other Fiduciary designated by the employer in its adoption agreement and any successor thereto." The Adoption Agreement designated Tru-Tech as the administrator and named fiduciary, and Tru-Tech subsequently appointed W.A. Williams as Plan Administrator at its December 4, 1981, board meeting. Thus, neither Peacock nor GP & C are fiduciaries within the express terms of the Plan.
 
 
 8
 However, analysis does not stop here. The Act extends the scope of the term "fiduciary" to those who actually exercise discretionary authority, control or responsibility over a plan. Section 1002(21)(A) defines a fiduciary as follows:
 
 
 9
 [A] person is a fiduciary with respect to a plan to the extent (i) he exercises any discretionary authority or discretionary control respecting management of such plan or exercises any authority or control respecting management or disposition of its assets, ... or (iii) he has any discretionary authority or discretionary responsibility in the administration of such plan.
 
 
 10
 29 U.S.C. Sec. 1002(21)(A). The phrase "to the extent" indicates that "in defining 'fiduciary' Congress was peculiarly concerned with realities, as distinguished from mere formalities." Fulk v. Bagley, 88 F.R.D. 153, 162 ((M.D.N.C.1980). We must focus "on the function performed, rather than on the title held." Blatt v. Marshall and Lassman, 812 F.2d 810, 812 (2d Cir.1987). See also H.R.Rep. No. 1280, 93d Cong., 2d Sess., reprinted in 1974 U.S.Code Cong. & Ad.News 4639, 5038, 5103 ("[T]he definition includes persons who have authority and responsibility with respect to the matter in question, regardless of their formal title.").
 
 
 11
 As a result of this pragmatic inquiry, a person not designated as a fiduciary by a plan may yet be a fiduciary under ERISA if that person exercises powers listed in Section 1002(21)(A). However, an officer or director of a corporation is not a fiduciary merely because of his or her position in the corporation, as an interpretive bulletin issued by the Labor Department explains. This bulletin reads in pertinent part:
 
 
 12
 D-4 Q: In the case of a plan established and maintained by an employer, are members of the board of directors of the employer fiduciaries with respect to the plan?
 
 
 13
 A: Members of the board of directors of an employer which maintains an employee benefit plan will be fiduciaries only to the extent that they have responsibility for the functions described in section [1002](21)(A) of the Act.
 
 
 14
 * * *
 
 
 15
 * * *
 
 
 16
 D-5 Q: Is an officer or employee of an employer or employee organization which sponsors an employee benefit plan a fiduciary with respect to the plan solely by reason of holding such office or employment if he or she performs none of the functions described in Section [1002](21)(A) of the Act?
 
 
 17
 A: No.
 
 
 18
 ERISA Interpretive Bulletin 75-8, 29 C.F.R. Sec. 2509.75-8 (1983). But an officer or director actually exercising fiduciary, rather than corporate, powers is subject to ERISA liability as a fiduciary. See, e.g., Anderson v. Ciba-Geigy Corp., 759 F.2d 1518, 1522 (11th Cir.1985) (where court held that the corporate executive, who was "acting as a fiduciary," was liable "whatever his title, or whether he was named as a fiduciary or not....").
 
 
 19
 Thomas argues that Peacock, although not designated a fiduciary, exercised fiduciary power by allegedly executing the ten-year cliff vesting amendment which led to the termination of the Plan.[1] However, the district court held that Peacock acted solely in his capacity as Chairman of the Board of Tru-Tech, not as a fiduciary of the Plan. Indeed, the record reveals that Tru-Tech's Board of Directors resolved in a meeting on October 11, 1984, to retain the ten-year cliff vesting schedule. Conceding this, Thomas insists that Peacock, as the principal investor, dominated the Board and had de facto power to make these decisions concerning the Plan. But this influence has scant evidentiary support and does not contradict the finding that these decisions were made by the Board, not Peacock acting unilaterally. Thus, Thomas fails to demonstrate that the district court clearly erred in finding that Peacock did not possess sufficient discretionary authority and control over the Plan to make him a fiduciary.
 
 
 20
 Regarding the status of GP & C as an ERISA fiduciary, the district court held that "[w]hile Tru-Tech shared offices in Pittsburgh with [GP & C] and certain individuals were officers of both companies, there is no suggestion that [GP & C] exercised any authority or control in connection with the Tru-Tech salaried pension plan or for that matter, any of the affairs of Tru-Tech." Thomas failed to give any evidence linking GP & C with Tru-Tech's decision to adopt the ten-year cliff vesting schedule or with any affairs of Tru-Tech, other than the fact that both Peacock and Williams were officers of GP & C, and the district court did not err in finding this unpersuasive.[2]
 
 II
 
 21
 The district court held that Tru-Tech's attempt to change from the 4-40 vesting schedule to the less favorable ten-year cliff vesting schedule violated not only Paragraph 15.3 of the Plan,[3] but also 29 U.S.C. Sec. 1053(c), which states that once a vesting schedule becomes effective, it cannot be changed to a less favorable vesting schedule.[4] In its cross-appeal, Tru-Tech argues that two of the district court's factual findings underlying this holding are erroneous: (a) that Wilcock and Myers had the authority to execute the 4-40 vesting schedule amendment and thereby bind Tru-Tech (Findings of Fact ## 5, 6 & 7); and (b) that the IRS approved the 4-40 vesting schedule (Finding of Fact # 8).
 
 A. The Validity of the 4-40 Amendment
 
 22
 The district court found as a matter of fact that the amendment by Wilcock and Myers changing the Plan from the ten-year cliff vesting schedule to the 4-40 schedule was valid because they had the actual and apparent authority to make such an amendment. At a meeting on December 4, 1981, Tru-Tech's Board resolved that its executive officers, including Wilcock and Myers, were
 
 
 23
 authorized to make such technical and administrative amendments to the Plans ... as they in their discretion deem advisable or as may be requested by the Internal Revenue Service or other governmental bodies.
 
 
 24
 (Emphasis added.) Finding that the 4-40 vesting schedule amendment was technical in that "the vast majority of the key employees ... would have been vested under either schedule," the court held that the amendment was a valid exercise of Wilcock's and Myers' authority. Tru-Tech argues that the 4-40 amendment was clearly substantive in nature because "[w]hile approximately 50% of the employees were fully vested under the ten year cliff vesting provided in the Plan as originally adopted, some 80% of the employees would have already achieved vesting at the 40% level at the time they entered employment at Tru-Tech." Although Tru-Tech's statistical formulation provides another way of looking at the amendment, it does not directly contradict the district court's own analysis. We find persuasive the fact that this amendment was requested by the IRS, and Wilcock and Myers were merely complying with the aforementioned Board resolution in going along with an IRS request. Therefore, we cannot say that this finding was clearly erroneous.
 
 B. IRS Approval
 
 25
 The second finding crucial to the district court's holding is whether the 4-40 vesting schedule amendment resulted in the Plan becoming effective. In addressing this issue, the district court looked to Paragraph 15.7 of the Plan, which covers approval by the Internal Revenue Service:
 
 
 26
 Notwithstanding any other provisions of this Plan, the Employer's adoption of this Plan is subject to the condition precedent that the Employer's Plan shall be approved and qualified by the Internal Revenue Service as meeting the requirements of section 401(a) of the Internal Revenue Code.
 
 
 27
 The district court found that "[f]ollowing the adoption of the 4-40 vesting schedule the plan did, in fact, meet the requirements of Sec. 401(a) of the Internal Revenue Code and was, in fact, approved and qualified by the [IRS]."
 
 
 28
 This finding is not clearly erroneous. In the IRS' proposed adverse determination letter to Tru-Tech, apparently dated January 31, 1985, the IRS indicated that it had previously approved the 4-40 vesting schedule amendment:
 
 
 29
 The waiver of minimum funding and the amendment to the plan was approved on May 30, 1984 as a National Office Technical Advice Memorandum. The file was subsequently returned to the Atlanta Key District EP/EO Division for consideration of the response by the National Office in their Technical Advice Memorandum.
 
 
 30
 In its letter to the IRS dated July 23, 1984, T.H. Williams, Executive Vice President of Tru-Tech, said that the "IRS subsequently approved the plan." Tru-Tech contends that this approval was preliminary, not final, because the IRS rejected the Plan in the very same letter. Yet Tru-Tech provides no argument as to why this approval, even if preliminary, did not satisfy the requirements of Paragraph 15.7 of the Plan, as the district court held. Indeed, nothing in Paragraph 15.7 dictates that the IRS' approval be written or final. Tru-Tech also points out that Williams testified that his statement that the IRS had approved the Plan was erroneous. However, we see no reason to disturb the district court's implicit rejection of the credibility of this testimony.
 
 III
 
 31
 For the above reasons, we affirm the judgment of the district court.
 
 
 32
 AFFIRMED.
 
 
 
 [1]
 Thomas also argues that Peacock exercised fiduciary power by misrepresenting to the IRS that the 4-40 vesting schedule amendment lacked proper approval of Tru-Tech's Board of Directors. However, the district court found that T.H. Williams, not Peacock, made this statement, whether or not a misrepresentation, in his correspondence with the IRS in the latter half of 1984
 
 
 [2]
 Alternatively, Thomas argues that even if Peacock and GP & C are not fiduciaries, "they are liable as nonfiduciaries who knowingly participated in the fiduciary's breach of duty." Since this argument was not raised before the district court, we decline to consider it on appeal. Farish v. Courion Industries, Inc., 754 F.2d 1111, 1118 (4th Cir.1985) ("[We] will not, in the absence of clear error, consider issues not raised in the court below")
 
 
 [3]
 Paragraph 15.3 of the Plan provides as follows:
 CONDITIONS OF AMENDMENT: Neither the Sponsor nor Employer shall make any amendment which would cause the Plan to lose its status as a qualified plan within the meaning of Sec. 401(a) of the Internal Revenue Code.
 
 
 [4]
 Section 1053(c)(a)(A) states in part:
 A plan amendment changing any vesting schedule under the plan shall be treated as not satisfying the requirements of subsection (a)(2) of this section if the nonforfeitable percentage of the accrued benefit derived from employer contributions ... of any employee who is a participant in the plan is less than such nonforfeitable percentage computed under the plan without regard to such amendment.